UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERNARD W. GOONEWARDENA,

Plaintiff,

v.

STATE OF NEW YORK WORKERS
COMPENSATION BOARD and WINSTON
FARNUM,

Defendants.

No. 09-CV-8244 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Bernard Goonewardena brings this discrimination and retaliation action against

his former employer, the New York Workers' Compensation Board (the "WCB") and his former

supervisor, Winston Farnum. Plaintiff asserts claims under 42 U.S.C. § 1983, Title VII of the

Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), and the New

York City Human Rights Law ("NYCHRL"). Following a three-day bench trial, judgment shall

be entered for Defendants.[1]

## FINDINGS OF FACT

### A.    The Parties

Plaintiff is a 78-year-old native of Sri Lanka who identifies as South Asian. *See* Pl. Aff.

¶¶ 1–2. He was educated in Sri Lanka and moved to the United States in 1968. *See id.* ¶¶ 4, 9.

The WCB is a New York state agency responsible for enforcing New York's workers'

---

[1] The Court thanks Mark Baghdassarian, Marcus Colucci, John Dillon, Cristina Martinez, and
Jane Gross of Kramer Levin Naftalis & Frankel, LLP for their pro bono representation of Plaintiff at trial.
Their performance was exceptional, and the Court is extremely grateful for their service.

compensation laws. *See* Aff. of Winston Farnum ("Farnum Aff.") ¶ 3. Farnum served as a Compensation Investigator II at the WCB's Bureau of Compliance from 2001 to 2010. *See id.* ¶ 1. Farnum was Plaintiff's direct supervisor during Plaintiff's employment with the WCB. *See id.* ¶ 9. Farnum testified that he "is of Barbados ancestry" and that his "skin is brown, otherwise colloquially known as 'black.'" *Id.* ¶ 40.

## B.     Plaintiff's Hiring and Training

In or about August or September 2007, Plaintiff applied for a position as a Compensation Investigator I at the WCB's Harlem District Office. *See* Pl. Aff. ¶ 25. There is no dispute that Plaintiff was qualified for this position, as he had received a score of 85 percent on his civil service exam and had experience as a compensation investigator. *See id.* ¶ 26; Defs.' Ex. B at 2. Plaintiff was interviewed by Farnum, Leonard Frasco, and other WCB employees. *See* Pl. Aff. ¶ 30. Plaintiff was hired, and he began work on October 4, 2007. *See id.* ¶ 36; Pl. Ex. 2.[2]

During Plaintiff's employment with the WCB, a Compensation Investigator I was a field investigator responsible for evaluating businesses' compliance with New York's workers' compensation laws. *See* Pl. Aff. ¶ 27; Farnum Aff. ¶ 10; Aff. of Leonard Frasco ("Frasco Aff.") ¶ 8. A Compensation Investigator I was expected to visit businesses to determine the status of their workers' compensation insurance. *See* Pl. Aff. ¶ 27; Farnum Aff. ¶ 10; Frasco Aff. ¶ 8. A Compensation Investigator I was also expected to write clear, concise, and accurate reports. *See* Farnum Aff. ¶ 10; Frasco Aff. ¶ 8. In general, a Compensation Investigator I spent two to three days each week in the field and the remaining weekdays in the office. *See* Frasco Aff. ¶ 8; Trial Tr. ("Tr.") at 30:22–25.

---

[2] Plaintiff's exhibits numbers refer to the numbers used on the tabs of Plaintiff's pre-trial binder; they do not refer to the handwritten numbers some of these exhibits contain.

Upon starting at the WCB, Plaintiff was given one week of training, as were other newly hired employees. *See* Farnum Aff. ¶ 11; Frasco Aff. ¶¶ 5, 7; Tr. at 27:7–25. This training consisted of, as Plaintiff testified, an "initial overview" of the responsibilities of a Compensation Investigator I. Pl. Aff. ¶ 47.

According to Plaintiff, he received less training than other newly hired Compensation Investigator Is. *See id.* ¶ 48; Tr. at 63:2–24. Farnum and Frasco denied this claim. *See* Farnum Aff. ¶ 11; Frasco Aff. ¶¶ 5, 7. For several reasons, the Court does not credit Plaintiff's testimony regarding the differences between his training and that of other employees. First, Plaintiff's trial testimony on the issue was vague: when asked to describe the additional training other employees received, he responded that he saw Farnum and two other newly hired employees "standing there [for] 45 minutes going through the computer screens" but that he "did not know what they were talking about." Tr. at 62:24–63:7. Second, Plaintiff's trial testimony conflicted to some degree with his affidavit: whereas Plaintiff's affidavit states that Farnum provided additional field training to Josseth Henry and Jamie Freeberg, *see* Pl. Aff. ¶ 48, Plaintiff testified at trial that Edward Peters—not Farnum—provided additional field training to Henry and Awilda Quiles, without mentioning Freeberg, *see* Tr. at 63:19–22. Finally, no evidence suggests that the WCB had any practice of tailoring its training for individual employees. Accordingly, the Court finds that Plaintiff did not receive less training than other newly hired Compensation Investigator Is.

## C.   Plaintiff's Initial Performance

During Plaintiff's first several months at the WCB, his performance was viewed as deficient in several respects. First, Farnum credibly testified that Plaintiff's investigative reports often contained significant errors. *See* Farnum Aff. ¶ 17; Tr. at 176:21–177:6. Indeed, Farnum

3

testified that approximately 20 to 25 percent of Plaintiff's reports contained errors, an error rate that was "very high" when compared to that of his colleagues. Tr. at 179:11–20. While the Court did not have the benefit of reviewing a large number of Plaintiff's reports, two were examined closely at trial, and Farnum provided a reasonable—if debatable—explanation of why one report contained enough errors to be rejected by a supervisor. *See* Tr. at 172:2–23, 173:19–22; Pl. Ex. 13. Frasco corroborated Farnum's testimony by testifying that he reviewed examples of Plaintiff's completed reports and determined that Plaintiff repeatedly made the same mistakes. *See* Frasco Aff. ¶ 9.

Second, Farnum credibly testified that, in his view, Plaintiff had trouble following instructions. *See* Farnum Aff. ¶ 19. Farnum concluded that Plaintiff either did not understand his instructions or thought his way was better. *See id.* As a result, Farnum often had to repeat himself, and Plaintiff's work was not completed on time. *See id.*

Third, Plaintiff's coworkers reported to his supervisors that Plaintiff was confrontational and uncooperative. *See* Frasco Aff. ¶¶ 10–11. For example, Frasco credibly testified that Plaintiff's coworkers informed him that "Plaintiff would ask them questions related to the work and then invariably reject their answers because Plaintiff thought that he knew better." *Id.* ¶ 10. Frasco further testified that Plaintiff's coworkers complained that, while in the field, Plaintiff would "openly disagree" with them in public, which created a "confrontational and uncomfortable work environment," as well as an "unprofessional public display." *Id.* ¶ 11. The Court again finds this testimony credible.

Fourth, Farnum found that Plaintiff's computer skills were inadequate. *See* Farnum Aff. ¶ 18. Farnum estimated that approximately 60 percent of an investigator's job involves the use

of a computer, and that, in his view, Plaintiff lacked the skills to use the WCB's computer system and business databases efficiently. *See id.*

The Court does not doubt that Plaintiff performed well at times. Plaintiff's affidavit states that, on at least some occasions, he capably informed various entities about the requirements of New York's workers' compensation laws. *See* Pl. Aff. ¶¶ 42–43. Defendants did not rebut this testimony at trial or demonstrate that Plaintiff was entirely incapable of doing his job. Rather, the evidence suggests that Plaintiff may have performed competently on at least some of his assignments, but that his overall performance during his first several months was subpar.

Concerns with Plaintiff's initial performance are reflected in the First Probationary Report, which Farnum completed on February 27, 2008. *See* Farnum Aff. ¶ 24; Pl. Ex. 7. In this report, Farnum gave Plaintiff a rating of "unsatisfactory" in three of the seven applicable performance categories. *See* Pl. Ex. 7. In particular, Farnum found Plaintiff's performance unsatisfactory in the categories of "Aptitude," "Relationship with Co-workers/Supervisor," and "Relationship with Public." *See id.* Farnum gave Plaintiff a satisfactory rating in the categories of "Quality of Work," "Work Habits," and "Attendance," and did not provide a rating for the category of "Quantity of Work." *See id.* In the narrative section of the report, Farnum wrote that Plaintiff (1) has "[b]elow standard computer skills," which he was "very slow to pick up," (2) "[h]as difficulty with interpersonal communications with fellow employees and has difficulty accepting directions from the supervisor," and (3) "[n]eeds improvement in communications with the public and employers." *Id.* On the whole, the Court finds that the First Probationary Report confirms that, in Defendants' view, Plaintiff performed inadequately during his first several months of employment.

To be sure, the First Probationary Report is not a model of clarity, and Farnum could have been more diligent in completing it. For example, the dates in the report are somewhat confusing: the report lists a "due date" of November 15, 2007, but it was completed in February 2008. *See id.* In addition, a box recommending "termination" was not checked, *see id.*, although Farnum testified that "[b]ased on the problems noted in the [First] Probationary Report it was being recommended that plaintiff be terminated," Farnum Aff. ¶ 25. At trial, these discrepancies were largely explained. For instance, Farnum testified that supervisors did not complete a probationary report until Human Resources delivered a blank copy of the form, *see* Tr. at 188:17–19, and that Plaintiff's form may not have been delivered until February 25, 2008, only two days before Farnum completed it, *see* Tr. at 221:23–25. Farnum further testified that, in practice, he typically recommended terminating a provisionary employee by discussing the matter with his own supervisor, and not necessarily by checking the "termination" box in a probationary report. *See* Tr. at 189:13–190:11. Furthermore, the report rates Plaintiff's "quality of work" as "satisfactory," which could seem inconsistent with Farnum's testimony that Plaintiff's work routinely contained errors. *Compare* Pl. Ex. 7, *with* Farnum Aff. ¶ 17. This potential discrepancy was also resolved at trial: Farnum consistently, and credibly, testified that Plaintiff's work in fact contained errors and that he should have checked "unsatisfactory" in this field. *See* Tr. at 135:20–24, 136:2. Overall, any discrepancies or omissions in the First Probationary Report do not undermine the Court's finding that this report accurately reflected Defendants' contemporaneous belief that Plaintiff's performance was deficient.

In December 2007, Farnum met with Frasco and reported his concerns with Plaintiff's performance. *See* Farnum Aff. ¶ 20; Frasco Aff. ¶ 12. The two men decided to recommend terminating Plaintiff's employment if his performance did not improve by the end of his first

three months at the WCB—that is, by the end of the first week of January 2008. *See* Farnum Aff. ¶ 20; Frasco Aff. ¶ 12. Frasco relayed this recommendation, as well as Farnum's concerns with Plaintiff's performance, to other WCB officials. *See* Tr. at 133:3–14.

## D.    Plaintiff's Leave of Absence and Initial Termination

On January 17, 2008, Plaintiff began a medical leave of absence after sustaining a knee injury. *See* Pl. Aff. ¶¶ 51, 57.

In a letter dated March 6, 2008, while Plaintiff was on leave, the WCB informed Plaintiff that his services would be terminated on March 20, 2008. *See* Pl. Ex. 5; Pl. Aff. ¶ 62; Aff. of Lisa Sunkes ("Sunkes Aff.") ¶ 24. Plaintiff responded by sending a series of letters challenging the WCB's decision and arguing that he should be reinstated. *See* Pl. Aff. ¶ 66; Sunkes Aff. ¶ 25. Some of these letters were lengthy—one contained 29 pages—and included discussions of Plaintiff's prior work experience and personal life. *See* Sunkes Aff. ¶ 25. In these letters and in other communications with WCB officials, Plaintiff threatened to take "the story of [his] termination" to New York newspapers. Pl. Aff. ¶ 68; *see also* Pl. Ex. 9 at 1. On March 20, 2008, the WCB informed Plaintiff that it had reversed its prior decision and that he would be reinstated. *See* Sunkes Aff. ¶ 30; Defs. Ex. L. According to Lisa Sunkes, who served as Director of Human Resources Management at the time, the WCB decided that Plaintiff should be given another opportunity to succeed. *See* Sunkes Aff. ¶ 28.

After Plaintiff was reinstated but before he returned to work, he continued to write letters to WCB officials. *See* Pl. Aff. ¶¶ 71–72. In some of these letters, Plaintiff indicated that he had a "normal or cordial relationship [his] supervisor," Pl. Ex. 9 at 2, and a "normal work environment" before his leave of absence, Pl. Ex. 10 at 3. In at least some of these letters, however, Plaintiff also alleged—for the first time—that he was subjected to discrimination and

7

that he feared he would be subjected to retaliation. *See, e.g.*, Pl. Ex. 10 at 2–3. For example, in a letter dated April 13, 2008, Plaintiff wrote that the reason given for his initial termination was "totally false given [his] outstanding performance in all jobs [he] held in New York state service" and that his termination "was done for discriminatory reasons." Pl. Ex. 11 at 4. Plaintiff added that he had been "accorded differential treatment than other American born employees." *Id.* Plaintiff indicated that, if he were terminated on the basis of "another negative performance evaluation," he would "fil[e] a case of discrimination based on national origin, age, harassment, and retaliation." *Id.* Defendants did not find Plaintiff's complaints credible and did not investigate further. *See* Sunkes Aff. ¶ 35; Tr. at 254:6–8, 295:13–296:2.

## E. Plaintiff's Return and Final Termination

On April 17, 2008, Plaintiff returned to work. *See* Pl. Aff. ¶ 74; Farnum Aff. ¶ 30. Plaintiff's affidavit asserts that, on his first day back at work, Farnum "angrily stated that [his] 'days are going to be numbered.'" Pl. Aff. ¶ 74. Plaintiff also claims that, at some point after he was reinstated, Farnum showed Plaintiff the letters he had sent to Sunkes and stated, "They are not going to believe anything that you have to say against me." *Id.* ¶ 82. The Court does not credit this testimony. Other than Plaintiff's own testimony, no evidence adduced at trial suggests that Farnum acted with the "nasty and aggressive and hostile" attitude Plaintiff described. Tr. at 72:16. Indeed, although Farnum found Plaintiff's work product unsatisfactory, he expressed genuine respect for Plaintiff as a person—even referring to him as "brilliant." Tr. at 198:10–11. Plaintiff's testimony is particularly incredible in light of Farnum's demeanor at trial: Farnum appeared candid and matter-of-fact, even when discussing his concerns with Plaintiff's performance and Plaintiff's allegations of discrimination, and exhibited no apparent hostility

8

towards Plaintiff. Indeed, no evidence suggests that Farnum expressed any frustration with Plaintiff through aggressive behavior or threats, as Plaintiff claims that he did.

Farnum testified that Plaintiff's performance did not improve after his reinstatement. *See* Farnum Aff. ¶ 32. He recalled that Plaintiff's reports continued to contain errors and that Plaintiff continued to have trouble using the WCB's computer system and databases. *See id.* Farnum also described continued complaints from Plaintiff's coworkers, who explained that Plaintiff was "disruptive" on field assignments, refused to follow directions, and spoke over his colleagues. *See id.* ¶ 33. Farnum ultimately concluded that Plaintiff was "incapable of performing his job responsibilities independently." *Id.* ¶ 32.[3]

In June 2008, several WCB officials held a conference call to discuss Plaintiff's performance. *See* Farnum Aff. ¶ 34; Sunkes Aff. ¶ 36. The group decided that, since Plaintiff's performance had not improved, his employment would be terminated. *See* Farnum Aff. ¶ 34; Sunkes Aff. ¶ 36.

On June 30, 2008, Farnum completed a Second Probationary Report. *See* Farnum Aff. ¶ 35; Pl. Ex. 12. The report stated that Plaintiff's performance was unsatisfactory in four of the seven applicable performance categories. *See* Farnum Aff. ¶ 35; Pl. Ex. 12. In the narrative section of the report, Farnum elaborated on the problems with Plaintiff's performance. With respect to "Quality of Work," Farnum wrote that Plaintiff's reports "have many errors." Pl. Ex. 12. Specifically, Farnum noted that nine of twelve reports recently submitted by Plaintiff were returned to him for corrections. *See id.* With respect to "Quantity of Work," the report noted that Plaintiff "works slowly" and that "his work production falls behind that of his co-workers."

---

[3] During this period, Farnum had informal conversations with Plaintiff, in which Farnum told Plaintiff that his performance needed improvement. *See* Tr. at 183:24–25, 232:18–19. Farnum did not, however, provide a formal counseling memorandum to Plaintiff regarding the issues with his performance.

9

*Id.* With respect to "Aptitude," the report explained that Plaintiff "was slow to learn the various databases which are used by the investigators" and "demonstrated a lack of understanding of some of the basic legal concepts used in our investigations." *Id.* Finally, with respect to "Relationships with Co-workers/Supervisor," Farnum wrote that Plaintiff "has cultivated adversarial relationships with his co-workers and his supervisor." *Id.* The report further explained that Plaintiff's coworkers "don't trust him" and "feel that his conduct while in the field with them can result in an unsafe work environment." *Id.* The Court finds that the Second Probationary Report accurately reflects Defendants' view of Plaintiff's performance following his reinstatement.

Once again, however, Farnum's completion of this report was flawed in some respects. For example, unlike in the First Probationary Report, the category "Relationship with Public" was marked as "satisfactory" in the Second Probationary Report, although the narrative section of this report states that Plaintiff "has disagreements with [his coworkers] in the presence of the public." *See id.* At trial, Farnum testified that Plaintiff's relationship with the public was in fact unsatisfactory, a view that he expressed through the narrative section of the report. *See* Tr. at 192:3–8. The Court finds that, although Mr. Farnum could have been more conscientious in completing the Second Probationary Report, the report nonetheless reflected his contemporaneous belief that Plaintiff's performance was deficient following his reinstatement.

The Second Probationary Report recommended terminating Plaintiff's employment. *See* Pl. Ex. 12. On July 1, 2008, Sunkes approved Plaintiff's termination. *See* Sunkes Aff. ¶ 38. Plaintiff's termination became effective on July 9, 2008. *See* Pl. Aff. ¶ 96; Pl. Ex. 15.

## F. Alleged Incidents of Discrimination

Plaintiff claims that, after he was reinstated but before his final termination, Farnum made several negative comments about his race, national origin, and age. *See* Pl. Aff. ¶¶ 75–79. In particular, Plaintiff testified that Farnum told him that he came "from the third world," that he was "senile," and that he "was black . . . not white." *Id.* ¶¶ 75–76. Farnum denies making these remarks. *See* Farnum Aff. ¶ 39.

The Court does not credit Plaintiff's claim that Farnum made discriminatory statements about his race, national origin, or age. This credibility finding is based in part on Plaintiff's demeanor while testifying. It is also based on the timing of events and the fact that Plaintiff himself testified that Farnum did not make *any* discriminatory statements prior to his initial termination. *See* Tr. at 51:13–21. Indeed, Plaintiff's contemporaneous letters indicated that his relationship with Farnum during the first several months of his employment was "normal or cordial." Pl. Ex. 9 at 2; *see also* Pl. Ex. 10 at 2–3 ("I want a normal work environment and relationship as that existed before my absence from work."). Plaintiff did not explain why, after several months of a normal or cordial relationship, Farnum would begin to make discriminatory remarks. Finally, the Court's credibility finding is based on some of the alleged remarks themselves. For example, Plaintiff claims that Farnum stated, "You are no diplomat . . . . My daughter is a diplomat in England." Pl. Aff. ¶ 76. In light of the undisputed trial testimony that Farnum's daughter is not in fact a diplomat, but rather an actuary, it seems highly unlikely that Farnum would make such a statement. *See* Tr. at 197:19–198:1.

By contrast, the Court found Farnum's testimony credible on the issue of any allegedly discriminatory remarks. This credibility finding is also based, in part, on demeanor: Farnum appeared candid, matter-of-fact, and balanced throughout his testimony on this subject. Farnum

11

also appeared fair and respectful in his assessment of Plaintiff—Farnum even described Plaintiff as a "brilliant human being." Tr. at 198:10–11. In addition, Farnum credibly testified that he would not make such remarks because, as a member of several protected groups himself—he is a black man of Barbados ancestry—he is "sensitive to the equal treatment and supervision of all employees." Farnum Aff. ¶ 40. In Farnum's words, he "live[s] in a glass house" and does not "want to throw a stone." Tr. at 198:14–15. Finally, both Farnum and Frasco testified that Farnum worked well with several other South Asian employees, at least some of whom were over 65 and at least some of whom were not born in the United States. *See* Farnum Aff. ¶ 41; Frasco Aff. ¶ 20; Tr. at 194:23–196:21, 299:25–301:7.[4] Farnum further testified that, at some point, three of his seven subordinates were South Asian. *See* Tr. at 197:1–3. For these reasons, the Court does not credit Plaintiff's allegation that Farnum made discriminatory remarks to Plaintiff regarding his race, national origin, or age.

Plaintiff also provided evidence that, in March 2008, the WCB hired two younger, African American individuals, Al John and Onyewuchi Echefu. *See* Pl. Aff. ¶ 84; Tr. at 142:1–7. These individuals filled one position that was vacant when Plaintiff began at the WCB and one that was left vacant when Plaintiff was on medical leave. *See* Pl. Aff. ¶ 84. They were both given offers before Plaintiff was terminated. *See* Tr. at 98:10–12. The Court does not, however, find that these two individuals were less qualified than Plaintiff for the role of Compensation

---

[4] At trial, the Court ruled that evidence of other employees' races, nations of origin, and age were admissible, as this evidence may be probative of Defendants' motivation in taking any adverse employment actions against Plaintiff. Tr. at 157:23–158:23; *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580 (1978) (holding that a district court was "entitled to *consider* the racial mix of the work force when trying to make the determination as to motivation" in the employment discrimination context (emphasis in original)); *Mobasher v. Bronx Cmty. Coll. of City of N.Y.*, 269 F. App'x 71, 74 (2d Cir. 2008) (summary order) (holding that "the District Court's decision to admit testimony regarding the race of [other employees] was not an abuse of discretion," as this evidence "tends to show that, insofar as [the defendant] was responsible for the adverse employment actions that Plaintiff has identified, those actions were not motivated by discrimination").

12

Investigator I. At trial, Plaintiff did not present evidence suggesting any significant difference between Plaintiff's qualifications and those of these two individuals. Moreover, one of the key qualifications for the role of Compensation Investigator I was performance on the civil service exam, and documentary evidence showed that Echefu had received the same score as Plaintiff on the exam. *See* Pl. Ex. 1 at 3.

## CONCLUSIONS OF LAW

### A. Discrimination Claims

#### 1. Title VII, Section 1983, and the New York State Human Rights Law

Plaintiff first brings discrimination claims against the WCB under Title VII and against Farnum under Section 1983 and the NYSHRL, claiming that he was terminated on the basis of his race, national origin, and age.

These discrimination claims are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *United States v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013). To establish a *prima facie* case, Plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). The Supreme Court has "characterized this initial burden as 'not onerous,' . . . and as 'minimal.'" *Littlejohn v. City of New York*, 795 F.3d 297, 308 (2d Cir. 2015) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see also Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) ("The requirement is neither onerous nor intended to be rigid, mechanized or ritualistic." (quoting

13

*Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001))). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega*, 801 F.3d at 83. "The burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804). Of course, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Burdine*, 450 U.S. at 253).

### a. *Prima Facie* Case

Plaintiff has established a *prima facie* case of discrimination. First, Plaintiff was a member of a protected class: he is South Asian, a native of a country other than the United States, and over the age of 65. *See* Pl. Aff. ¶¶ 1–2. Second, Plaintiff was qualified for his position as a Compensation Investigator I: he met the WCB's requirements through his score on the civil service exam and his prior work as a compensation investigator. *See id.* ¶ 26; Defs.' Ex. B at 2. Third, Plaintiff suffered an adverse employment action because his employment was terminated. *See* Pl. Aff. ¶ 96.

With respect to the fourth factor, Plaintiff has shown that the circumstances of his termination give rise to an inference of discrimination. A court may infer discrimination from a variety of circumstances, including:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the

14

> plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). Of particular importance in this case, "[t]he fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis." *Littlejohn*, 795 F.3d at 313. Here, Plaintiff has shown that he was replaced by two individuals outside his protected class, both of whom are younger African Americans. *See* Pl. Aff. ¶ 84. The timing of Plaintiff's replacement further supports an inference of discrimination: the WCB offered these two individuals positions before Plaintiff's employment was terminated. *See* Tr. at 98:10–12. This evidence is sufficient to satisfy the fourth requirement of Plaintiff's *prima facie* case. *See Littlejohn*, 795 F.3d at 312–13; *see also, e.g., de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996) ("Because [a male Puerto Rican employee] was replaced by a black female, he . . . satisfies the fourth prong of the *prima facie* case."); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 453 (S.D.N.Y. 2013) ("Plaintiff's replacement by a white employee was enough evidence to get her past the *prima facie* stage . . . ."), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order).[5]

---

[5] Of course, an employer's degrading remarks may also be "probative of discriminatory intent." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). As discussed above, however, the Court does not credit Plaintiff's claim that Farnum made any remarks regarding Plaintiff's race, national origin, or age. Thus, the Court's finding that Plaintiff has established a *prima facie* case does not rest on evidence of any discriminatory remarks made to Plaintiff.

### b. Legitimate, Non-Discriminatory Reasons for Termination

Because Plaintiff has established a *prima facie* case, the burden shifts to Defendants to articulate some legitimate, non-discriminatory reason for terminating Plaintiff's employment. "'The defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr.*, 509 U.S. at 507 (emphasis in original) (quoting *Burdine*, 450 U.S. at 254–55 & n.8). Defendants have carried this burden.

Defendants have explained that they terminated Plaintiff on the basis of several perceived deficiencies in his performance. First, Defendants determined that Plaintiff's written work often contained significant errors. *See* Farnum Aff. ¶ 17; Tr. at 176:21–177:6. Specifically, Farnum estimated that approximately 20 to 25 percent of Plaintiff's investigative reports contained errors—an error rate that was "very high" when compared to that of his colleagues. Tr. at 179:11–20. Frasco likewise testified that he viewed several examples of Plaintiff's work and found that Plaintiff repeatedly made the same mistakes. *See* Frasco Aff. ¶ 9. Defendants' contemporaneous records document this concern. In the Second Probationary Report, for example, Farnum noted that Plaintiff's quality of work was unsatisfactory, as his reports "have many errors." Pl. Ex. 12. Indeed, the Second Probationary Report notes that nine out of twelve of Plaintiff's recently completed reports were returned with errors. *See id.*

Second, Defendants found that Plaintiff established poor relationships with his colleagues. For example, Farnum testified that he received reports from two of Plaintiff's coworkers that Plaintiff "would be disruptive, would talk over his co-workers while they were speaking, and refused to follow directions." Farnum Aff. ¶ 33. Frasco similarly testified that

16

Plaintiff's coworkers complained about Plaintiff's behavior, explaining that he would "openly disagree" with them and left them feeling "uncomfortable." Frasco Aff. ¶ 11. Defendants' contemporaneous records again reflect this concern. In the Second Probationary Report, for instance, Farnum wrote that Plaintiff had "cultivated adversarial relationships with his co-workers and his supervisor." Pl. Ex. 12. Indeed, the report explains that other WCB employees reported feeling "uneasy working with him," and explained that they "don't trust him" and feared that "his conduct while in the field with them can result in an unsafe work environment." *Id.*

Third, Defendants concluded that Plaintiff did not follow instructions. For example, Farnum testified that Plaintiff refused to follow his instructions, either because Plaintiff did not understand the instructions or preferred to do things his way. *See* Farnum Aff. ¶ 19. As a result, Farnum was often forced to repeat himself, and Plaintiff's work was not completed on time. *See id.* The Second Probationary Report similarly explains that Plaintiff "does not take directions well from his supervisor" and "routinely dismisses the advice of his supervisor." Pl. Ex. 12.

Fourth, Defendants found that Plaintiff did not communicate well with members of the public. Because the role of a Compensation Investigator I required frequent on-site visits to businesses, effective communication with business owners and other members of the public was a key part of the job. Plaintiff's colleagues, however, informed his supervisors that Plaintiff "creat[ed] an unprofessional public display" while working with the public, in part because he tended to "openly disagree" with his coworkers while on field assignments. Frasco Aff. ¶ 11; Pl. Ex. 12.

Finally, Defendants found that Plaintiff was not sufficiently skilled in using the WCB's computer system and databases. Farnum testified that Plaintiff was slow to pick up the computer

17

skills necessary to use the WCB's system, and that these skills were critical to the work of a Compensation Investigator I. *See* Farnum Aff. ¶ 18. In the Second Probationary Report, Farnum wrote that Plaintiff "works slowly" and that "his work production falls behind that of his co-workers." *See* Farnum Aff. ¶ 35; Pl. Ex. 12.

These reasons constitute legitimate, non-discriminatory reasons for an adverse employment action. *See, e.g.*, *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74–75 (2d Cir. 2015) (citing an employee's lack of "collegiality" as a legitimate basis for an employer's adverse decision); *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 126 (2d Cir. 2012) (summary order) ("The defendants . . . proffered legitimate, nondiscriminatory reasons for [an employee's] discharge, namely that: (1) he spoke to his coworkers and his supervisor in an unprofessional manner; (2) he failed to complete projects assigned to him; (3) he did not work well with others, particularly on team projects; (4) he did not communicate well; and (5) he failed to follow instructions and often deviated from assigned tasks and questioned the work of others, while failing to complete his own."); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) ("Defendants have plainly put forward legitimate, non-discriminatory reasons for his termination: namely, that Plaintiff resented receiving instructions from his supervisors, refused to perform certain assignments, was the subject of complaints . . . and was repeatedly confrontational with, even threatening to, his supervisors."); *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 429 (E.D.N.Y. 2012) (finding that "complaints about plaintiff's communication style" and concerns regarding the accuracy of the employee's reports constituted legitimate, non-discriminatory reasons for her termination).

18

### c. Pretext

The burden thus shifts back to Plaintiff to show that Defendants' reasons for his termination were pretextual. "[I]n applying the *McDonnell Douglas* test to determine whether an employer's putative purpose is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993). "Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *Id.* at 171. "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *Id.*; *see also, e.g.*, *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 246 (S.D.N.Y. 2014) ("Plaintiffs may establish pretext . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." (alterations omitted) (internal quotation marks omitted)).

Plaintiff has attempted to show pretext in several ways. First, Plaintiff argues that Defendants' negative assessment of his performance is pretextual because it derives mostly from the findings of Farnum, whom Plaintiff argues is unreliable. As discussed above, however, the Court finds that Farnum provided credible testimony regarding his experience as Plaintiff's supervisor. In particular, the Court credits Farnum's testimony that he did not make discriminatory remarks against Plaintiff and finds that Farnum did not harbor any animus against Plaintiff that would call into question the truth of his statements regarding Plaintiff's performance.

Second, Plaintiff argues that Defendants' stated reasons for terminating him are inconsistent with the documentary evidence. It is true that inconsistencies in an employer's explanation for taking an adverse action may support a finding of pretext. *See, e.g.*, *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d Cir. 2013); *Sullivan v. N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 100 (S.D.N.Y. 2016). Plaintiff notes that the First Probationary Report states that his "Quality of Work" was "satisfactory," even though Farnum's testimony and the Second Probationary Report indicated that Plaintiff's work often contained significant errors. As discussed above, however, the Court finds that this discrepancy was resolved at trial, as Farnum credibly testified that Plaintiff's work contained unacceptable errors and that he should have stated that Plaintiff's quality of work was unsatisfactory in the First Probationary Report. Plaintiff also notes that his "Relationship with Public" rating was unsatisfactory in the First Probationary Report but not in the second. Again, a reasonable explanation was provided at trial: in the second report, although the box for "unsatisfactory" in this field was not checked, the narrative section indicated that Plaintiff had "disagreements with [his coworkers] in the presence of the public." Pl. Ex. 12. Thus, while the discrepancies Plaintiff identifies may demonstrate that Defendants were not as careful with their paperwork as they should have been, they do not suggest that Defendants' proffered reasons for terminating Plaintiff were pretextual.

Third, Plaintiff points to alleged irregularities in the process of terminating him. Plaintiff is correct that "[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Tolbert*, 790 F.3d at 438 (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)). Here, Plaintiff points out that the decision to terminate him on both

occasions may have been made in meetings *before* the probationary reports were completed. The evidence, however, demonstrated that this sequencing was not entirely irregular. Indeed, Linda Doody, then the Director of Personnel at the WCB, testified that "a lot of agencies" did not complete probationary reports before deciding to terminate an employee. Tr. at 107:22. And even if it were out of the ordinary to make a termination decision in a staff meeting before a probationary report was completed, Plaintiff has not shown that the decisions made in these meetings were based on anything other than his poor performance. In fact, the meeting participants consistently testified that Plaintiff's performance was the key subject of both the December 2007 meeting and the June 2008 conference call, where the termination decisions were made. *See, e.g.*, Farnum Aff. ¶¶ 20, 34; Sunkes Aff. ¶ 36; Tr. at 133:3–14. Thus, the Court does not find that any procedural irregularities in terminating Plaintiff demonstrate that Defendants' stated reasons for their decision were pretextual.

Fourth, Plaintiff has attempted to show pretext through the hiring of replacements who were not members of his protected class. Evidence that an employee was replaced by an individual outside his protected group—particularly if that individual is less qualified—may be probative of pretext. *See, e.g.*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("Under this Court's decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext."); *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–188 (1989) ("The [employee] might seek to demonstrate that [the employer's] claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position."), *superseded on other grounds by* 42 U.S.C. § 1981(b). Here, Plaintiff presented evidence that he was replaced by two individuals outside his protected group: namely, John and Echefu, both of whom are younger and African American. This evidence, while

21

relevant, is ultimately insufficient to establish pretext. In particular, while Plaintiff asserts that he was more qualified than his replacements, he has not provided evidence—other than his own testimony—that his replacements were less qualified for the position of Compensation Investigator I. Indeed, Plaintiff provided no evidence of his replacements' qualifications, and he did not dispute that one of his replacements received the same score on the qualifying exam as he did.[6] Thus, evidence of Plaintiff's replacements does not demonstrate that Defendants' reasons for his termination were pretextual. *See, e.g.*, *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (holding that replacement evidence did not demonstrate pretext where the plaintiff merely "assert[ed] her personal belief that she was the most qualified person for the various positions"); *Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 394 (S.D.N.Y. 2016) (finding that replacement evidence did not establish pretext where, *inter alia*, the plaintiff offered "insufficient evidence, if any evidence at all, to contest the qualifications" of his two replacements, did "not dispute that [one of his replacements] had the same test score as he," and relied primarily on his "subjective belief that he was more qualified for the position").

Fifth, Plaintiff argues that, contrary to Defendants' testimony, he was a strong performer. "In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Rather, the focus is on "what '*motivated* the employer,'" and "the factual validity of the underlying imputation against the employee is not at issue." *Id.* (emphasis in original) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *see also, e.g.*, *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 508 (S.D.N.Y. 2010) ("Defendant has documented

---

[6] Prior to trial, the Court denied Defendants' motion *in limine* seeking to exclude evidence of other employees' qualifications and explained that evidence of the qualifications of Plaintiff's replacements may be relevant on the issue of pretext.

a series of complaints against Plaintiff . . . . It is not for the Court to decide whether these complaints were truthful or fair, as long as they were made in good faith."). Thus, even if Plaintiff were correct that he did in fact perform well by industry standards, he would still not have shown that Defendants acted in bad faith. In any event, the trial evidence did not support Plaintiff's claim that his work was satisfactory. Rather, the evidence, which consisted of trial testimony, contemporaneous performance evaluations, and samples of his work product, tended to show that Plaintiff's overall performance fell short of the standards set for employees in his position. *See, e.g., Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 514 (S.D.N.Y. 2014) (finding that "defendants' contention that plaintiff's poor performance—and not unlawful discrimination—prompted her termination" was not pretextual in light of "numerous contemporaneous documents from multiple sources, including [the plaintiff's] supervisor and others who directly reviewed her work, attesting to problems with [her] editing skills, work product, pace of work, and comedic sensibilities."); *Finn v. N.Y.S. Office of Mental Health-Rockland Psychiatric Ctr.*, No. 08-CV-5142 (VB), 2011 WL 4639827, at *14 (S.D.N.Y. Oct. 6, 2011) ("A series of serious, independent, documented and therefore good faith complaints by an employer undermines an employee's argument that the employer's decision to terminate him was a pretext for discrimination." (internal quotation marks omitted)), *aff'd*, 489 F. App'x 513 (2d Cir. 2012) (summary order).

Sixth, Plaintiff has attempted to show pretext through evidence that he was not informed of any problems with his performance. Under some circumstances, the fact that an employee was not advised of perceived performance problems later cited as a basis for his termination may suggest pretext. *See, e.g., Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir. 2013) ("While [the employer] presented evidence of flaws in [the employee's]

23

performance throughout her employment, the company presented no evidence that anyone confronted her about these problems before she rejected [a supervisor's] alleged advances . . . ."). Here, the evidence suggests that Defendants could have done more to communicate their concerns to Plaintiff, and that Defendants may not have availed themselves of a formal counseling mechanism that could be appropriate in the context of performance issues. Nonetheless, Farnum informally advised Plaintiff of problems with his performance in several conversations. *See* Tr. at 183:24–25, 232:18–19. Thus, the Court is not persuaded that any failure to discuss performance issues with Plaintiff demonstrates that these issues were not, in fact, the basis for Defendants' decision.

Finally, the diversity of the WCB's staff undermines Plaintiff's claim that Defendants acted with any discriminatory motive in terminating him. "Proof that [an employer's] work force was racially balanced or that it contained a disproportionately high percentage of minority employees" may suggest that an adverse employment action was not "discriminatorily motivated." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580 (1978); *see also, e.g.*, *Wright v. Jewish Child Care Ass'n of N.Y.*, 68 F. Supp. 3d 520, 527 (S.D.N.Y. 2014) ("Courts have found that a showing that a workplace contains substantial racial diversity among the employees comparable to Plaintiff can negate any inference of discrimination that otherwise might have been created." (alteration omitted) (internal quotation marks omitted)). Here, Farnum and Frasco testified that the WCB employed several other South Asian employees, at least some of whom were not born in the United States and at least some of whom were over the age of 65. *See* Farnum Aff. ¶ 41; Frasco Aff. ¶ 20; Tr. at 194:23–196:21, 299:25–301:7. According to their testimony, which the Court finds credible, the WCB's other South Asian employees did not have noticeable difficulties at work, and at least one of them was promoted above the level of

24

Compensation Investigator I. Moreover, Farnum personally supervised, or was supervised by, South Asian employees during his time at the WCB—indeed, Farnum testified that, at some point, nearly half of his subordinates were South Asian. *See* Farnum Aff. ¶ 41; Frasco Aff. ¶ 20; Tr. at 197:1–3. In light of this evidence, as well as the other evidence presented at trial, the Court does not conclude that discriminatory animus against members of Plaintiff's protected groups played any role in his termination.

In sum, Plaintiff has not carried his burden of demonstrating that Defendants' legitimate, non-discriminatory reasons for his termination were pretextual. Thus, the Court concludes that Plaintiff has failed to establish that Defendants terminated him on the basis of his race, national origin, or age under Title VII, Section 1983, or the NYSHRL.

## 2. New York City Human Rights Law

Plaintiff also asserts a discrimination claim against Farnum under the NYCHRL. Under the NYCHRL, it is unlawful for an employer to discriminate against an individual "in compensation or in terms, conditions, or privileges of employment" because of the individual's race, national origin, or age. N.Y.C. Admin. Code § 8-107(1)(a). Pursuant to the New York City Council's revisions to the NYCHRL in the Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109. To prevail on an NYCHRL claim, a "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Id.* at 110; *see also Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009).[7] As under state and federal law, causation is an essential element of an

---

[7] "The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8-107(1)(a)." *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449–50 (E.D.N.Y. 2013).

NYCHRL claim: "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik*, 715 F.3d at 113.

Plaintiff has not demonstrated that he received any less favorable treatment because of his race, national origin, or age. As discussed above, Defendants have shown that Plaintiff was terminated because of his poor work performance, not his protected characteristics. And while it is true, as Plaintiff argues, that inferior training relative to that of his colleagues could, in theory, support an NYCHRL claim, the Court does not credit Plaintiff's testimony that he received any less training than his colleagues. Accordingly, Farnum is not liable to Plaintiff under the NYCHRL for discrimination on the basis of Plaintiff's race, national origin, or age.

## B. Retaliation Claims

### 1. Title VII, Section 1983, and the New York State Human Rights Law

Plaintiff next asserts retaliation claims against the WCB under Title VII and against Farnum under Section 1983 and the NYSHRL. These retaliation claims are also evaluated under the *McDonnell Douglas* burden-shifting framework, although the elements of the *prima facie* case are different. *See Littlejohn*, 795 F.3d at 315. To establish a *prima facie* case of retaliation, an employee must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 316. "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (citation omitted). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" *Ya-Chen Chen*, 805 F.3d at 70

26

(quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *Nieblas-Love*, 165 F. Supp. 3d at 70 ("'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action—it is enough that the adverse action would not have occurred in the absence of the retaliatory motive." (citing *Nassar*, 133 S. Ct. at 2533)).

Plaintiff has established a *prima facie* case of retaliation. First, Plaintiff participated in a protected activity. "When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (alteration omitted) (emphasis in original) (internal quotation marks omitted). Prior to his final termination, Plaintiff sent Defendants several letters in which he alleged that he was subjected to discrimination. *See, e.g.*, Pl. Aff. ¶ 72; Pl. Ex. 11. In his April 13, 2008 letter, for example, Plaintiff wrote that his initial termination "was done for discriminatory reasons" and that he had been "accorded differential treatment than other American born employees." Pl. Ex. 11 at 4. Plaintiff's communications to his employer plainly constitute protected activity. *See, e.g.*, *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (explaining that "informal protests of discriminatory employment practices, including making complaints to management" qualify as protected activities). Second, Defendants knew of this protected activity. There is no dispute that Defendants received Plaintiff's letters and were aware that they contained allegations of discrimination and retaliation. *See* Sunkes Aff. ¶ 35; Tr. at 254:6–8, 295:13–296:2. Third, Plaintiff suffered an adverse employment action, as his employment was terminated. *See* Pl. Aff. ¶ 96.

Finally, Plaintiff has shown a causal connection between his protected activity and the adverse employment action. "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Summa*, 708 F.3d at 127–28 (alteration omitted) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). Plaintiff was terminated approximately three months after submitting letters in which he expressed concerns about discrimination and retaliation. Under the circumstances of this case, this period is short enough to infer a causal connection and thus to create a presumption of retaliation. In particular, given that Plaintiff was evaluated at three-month intervals and that his termination occurred at the end of the three-month period in which he complained of discrimination and retaliation, the Court finds that Plaintiff's protected activities were followed closely enough in time to establish causation. *See, e.g., id.* at 129 (finding a causal connection on the basis of a seven-month period between protected activity and an adverse employment action); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding a period of six months sufficient to infer a causal connection); *Caputo v. Copiague Union Free Sch. Dist.*, 218 F. Supp. 3d 186, 195 (E.D.N.Y. 2016) (finding that a "seven months gap" between an employee's request for accommodation and the filing of disciplinary charges against her was not too attenuated to break the causal connection between the employee's protected activity and an adverse employment action).

The burden thus shifts to Defendants to articulate legitimate, non-retaliatory reasons for terminating Plaintiff. Defendants have carried this burden. As discussed above, Defendants have explained they terminated Plaintiff on the basis of several perceived deficiencies in his performance—namely, that his work contained a large number of errors, that he established adversarial relationships with his coworkers, that he did not follow instructions, that he behaved

inappropriately while communicating with members of the public, and that he lacked adequate computer skills to efficiently use the WCB's systems.

The burden next shifts back to Plaintiff to show that Defendants' proffered reasons for terminating him were pretextual and that, but for his protected activity, he would not have been terminated. Plaintiff has not carried this burden. As discussed above, Plaintiff has not shown that Defendants' stated reasons for his termination were not the true basis for their decision. Moreover, Defendants documented their concerns with Plaintiff's performance long before he engaged in any protected activity. In particular, Farnum completed the First Probationary Report, which identified several deficiencies in Plaintiff's performance, on February 27, 2008—weeks before Plaintiff threatened to "take the wrongful termination to the news media" and before he complained of discrimination and retaliation in letters to WCB officials. Pl. Aff. ¶¶ 67, 70–73; *see* Pl. Exs. 9, 10, 11. In addition, Defendants maintained a consistent view of Plaintiff's performance before and after he began engaging in protected activity. Indeed, the First Probationary Report, which was completed before Plaintiff's complaints of discrimination and retaliation, and the Second Probationary Report, which was completed after this protected activity, identify several of the same concerns, and both reports conclude that Plaintiff's performance was inadequate. *Compare* Pl. Ex. 7, *with* Pl. Ex. 12. On the basis of this evidence, the Court concludes that Defendants' stated concerns with Plaintiff's performance were not mere pretext for retaliation. *See, e.g.*, *Ya-Chen Chen*, 805 F.3d at 70–71 (holding that an employer's stated concerns with an employee's collegiality were not pretextual where the employer "took issue with [the employee's] collegiality long before" she filed a complaint and "maintained a consistent perspective afterwards"); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (noting that "the consistency of the viewpoint expressed by [a supervisor] . . . only further

29

supports [the employer's] proffered nondiscriminatory reason" for taking an adverse employment action).

Nor has Plaintiff established pretext through direct evidence of Defendants' retaliatory motives. Plaintiff's affidavit asserts that, when he returned to work on April 17, 2008, after writing complaints to the WCB, Farnum "angrily stated that [his] 'days are going to be numbered.'" Pl. Aff. ¶ 74. Plaintiff also claims that, at some point after he was reinstated, Farnum showed Plaintiff the letters he had sent to Sunkes and stated, "They are not going to believe anything you have to say against me." Pl. Aff. ¶ 82. As discussed above, however, the Court does not credit that Farnum made such statements. Thus, Plaintiff's argument that he has presented direct evidence of Defendants' retaliatory intent is unavailing.

In sum, the Court finds that Defendants are not liable to Plaintiff for retaliation under Section 1983, Title VII, or the NYSHRL.

## 2. New York City Human Rights Law

Finally, Plaintiff asserts a retaliation claim against Farnum under the NYCHRL. "[T]he retaliation inquiry under the [NYCHRL] is 'broader' than its federal counterpart." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) (citing *Williams*, 872 N.Y.S.2d at 34). Under the NYCHRL, "retaliation 'in any manner' is prohibited, and 'the retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment.'" *Id.* (alterations omitted) (quoting N.Y.C. Admin. Code § 8–107(7)). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that he took an action opposing his employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112. Under the NYCHRL,

"a plaintiff still must establish 'that there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for his termination was pretextual or motivated at least in part by an impermissible motive.'" *Baez v. Anne Fontaine USA, Inc.*, No. 14-CV-6621 (KBF), 2017 WL 57858, at *4 (S.D.N.Y. Jan. 5, 2017) (quoting *Weber v. City of New York*, 973 F. Supp. 2d 227, 273 (E.D.N.Y. 2013)).

Even under the NYCHRL's more liberal standard, Plaintiff cannot prevail on his retaliation claim. Although Plaintiff plainly "took an action opposing his employer's discrimination" by sending WCB several letters alleging discrimination, he has not demonstrated that Farnum terminated him or took any other adverse action against him "*as a result*" of this activity. *Mihalik*, 715 F.3d at 112 (emphasis added). Rather, as discussed above, the evidence shows that Farnum recommended Plaintiff's termination on the basis of legitimate concerns with his performance, and not on the basis of Plaintiff's opposition to discrimination. *Mihalik*, 715 F.3d at 112. Accordingly, Plaintiff is not entitled to relief under the NYHCRL.

## SANCTIONS

Plaintiff moves for sanctions regarding Defendants' alleged failure to preserve and produce records of the corrections made to his investigative reports. *See* Pl.'s Ltr. to Ct. (May 23, 2017); Pl.'s Ltr. to Ct. (May 25, 2017). While the Court is troubled by the possible spoliation of evidence, it declines to impose the sanctions Plaintiff requests.

### A. Background

At trial, both parties addressed the extent to which Plaintiff's investigative reports contained errors. Although corrected copies of two of Plaintiff's reports were admitted into evidence, the trial record did not contain drafts of Plaintiffs' reports or records identifying corrections made to his reports. When asked whether he had examples of Plaintiff's draft

reports, Farnum responded, "I kept a copy of the corrections that I made, but when I retired, as I mentioned yesterday, I threw everything—retired, I cleaned out my office." Tr. at 204:6–8. In response to the Court's questioning, Farnum explained that the WCB's stored copies of the reports were "the corrected copies," but that he had kept copies of "the front page [of the report] where . . . [he] had to make the corrections." Tr. at 205:1–5. Farnum testified that, shortly before his April 29, 2010 retirement, he threw away his copies of the reports because he "had to clean up the desk." Tr. at 205:11–15.

In response to this testimony, Plaintiff raised the issue of a possible discovery violation and requested sanctions. *See* Tr. at 206:3–9; Pl.'s Ltr. to Ct. (May 23, 2017). During a hearing on the issue, Defendants' counsel notified the Court that, just prior to the hearing, Farnum informed counsel that his former colleagues may have located "some of his old files that he kept which might include or does include some of the documents at issue." Tr. at 342:20–22. When asked by the Court, Plaintiff stated that he did not seek to reopen the trial and that the Court need not conduct any further investigation, including by questioning Farnum. Tr. at 348:15–18, 350:5–16, 353:7–13. There is no dispute that Plaintiff never requested the documents Defendants may have destroyed. *See* Defs. Ltr. to Ct. (May 24, 2017); Pl. Ltr. to Ct. (May 25, 2017).

As a sanction for the alleged spoliation of this evidence, Plaintiff requests that the Court "(i) strike all testimony from any defense witness regarding purported errors in Plaintiff's work product; and/or (ii) make an adverse inference that Plaintiff's work product did not contain errors as Defendants claim." Pl.'s Ltr. to Ct. at 1 (May 23, 2017).

**B.     Analysis**

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A party seeking sanctions for spoliation has the burden of demonstrating: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)); *see also, e.g.*, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted). Any sanction that a court chooses to impose must be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 779 (internal quotation marks omitted); *see also Chin*, 685 F.3d at 162. "Thus, how severe a sanction is warranted will depend on the extent of the discovered party's non-compliance with discovery obligations, the degree of that party's culpability, and the extent to which the non-compliance prejudiced the other parties." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010), *opinion adopted*, 271 F.R.D. 55

33

(S.D.N.Y. 2010). "[I]t is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy." *Tchatat v. O'Hara*, No. 14-CV-2385 (LGS) (GWG), 2017 WL 1379097, at \*4 (S.D.N.Y. Apr. 14, 2017) (citation omitted).

Assuming that Farnum's copies of the corrections to Plaintiff's reports were in fact destroyed, the Court concludes that the three elements of spoliation are satisfied. First, Defendants had an obligation to preserve these records at the time they were destroyed. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436. Here, at the latest, Defendants had an obligation to preserve relevant evidence when they were notified of Plaintiff's EEOC charge on June 5, 2009—several months before Farnum threw the reports away. *See* Defs.' Ltr. to Ct. at 3 (May 24, 2017); *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 48 (S.D.N.Y. 2014) ("[C]ourts in this Circuit regularly find that an EEOC charge puts an employer on notice that it likely faces future litigation."). Second, Farnum acted with a sufficiently culpable state of mind: although the Court does not find that Farnum acted in bad faith, he was at least negligent in failing to preserve all documents at issue. *See Residential Funding Corp.*, 306 F.3d at 108. Finally, as to the relevance requirement, the Court considers it unlikely that the missing evidence would have been favorable to Plaintiff.[8] Nevertheless, a reasonable factfinder *could* conclude that the reports would

---

[8] Notably, the Court examined two examples of Plaintiff's reports at trial. While Plaintiff testified that his reports were "perfect," Tr. at 59:18–19, Farnum credibly testified that one of the reports contained sufficient errors to be rejected by a supervisor, *see* Tr. at 172:2–23, 173:19–22. As discussed above, Farnum's analysis of this report may reasonably be questioned, and indeed it was at trial. At a minimum, however, Farnum's testimony, along with the Court's independent review of these two investigative reports, casts serious doubt on Plaintiff's claim that the destroyed evidence would support his case.

34

corroborate Plaintiff's testimony about his work product and undermine Defendants' testimony to the contrary. Thus, Plaintiff has satisfied the threshold requirements of a spoliation claim.

Under the facts of this case, however, the Court does not find that the "extreme sanctions" of preclusion or an adverse inference are appropriate. *Pall Corp. v. 3M Purification Inc.*, 279 F.R.D. 209, 213 (E.D.N.Y. 2011) (alteration omitted). Most importantly, Plaintiff has shown very little, if any, prejudice from the spoliation of the records at issue. "[A] court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice." *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 316 (S.D.N.Y. 2013) (citation omitted). "Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating . . . that during discovery [the other parties] never asked for the evidence later shown to have been spoliated." *R.F.M.A.S.*, 271 F.R.D. at 25; *see also Gutierrez-Bonilla v. Target Corp.*, No. 08-CV-3985 (JS) (AKT), 2009 WL 5062116, at *4 (E.D.N.Y. Dec. 16, 2009) ("Courts in the Second Circuit have consistently denied motions for spoliation sanctions where the moving party did not seek to inspect the evidence within a reasonable time." (collecting cases)). Here, there is no dispute that, since this case was filed more than seven years ago, Plaintiff never requested drafts of or corrections to his investigative reports or even inquired about their existence. Indeed, as Plaintiff does not dispute, these reports were not within the scope of any of his discovery requests in this action.[9] Thus, Plaintiff cannot claim that he was prejudiced by the destruction of these records, which he never asked to see. *See, e.g., Fujitsu*, 247 F.3d at 436 (affirming trial court's denial of

---

[9] In addition, it does not appear that Plaintiff ever requested the preservation of the records at issue. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007) (holding that a district court abused its discretion in imposing sanctions for spoliation, where the moving party did not request the preservation of the destroyed evidence and disclaimed any interest in it, despite a full opportunity to inspect the evidence).

a spoliation sanction in part because the moving party "admit[ted] that it never contacted [the opposing party] to seek an opportunity to inspect [the destroyed evidence] or otherwise request that [it] should be retained"); *Gutierrez-Bonilla*, No. 08-CV-3985 (JS) (AKT), 2009 WL 5062116, at \*4 (denying request for spoliation sanctions because "the Court is unaware of any discovery demands served by Plaintiff pertaining to preservation or inspection" of the destroyed evidence); *Klezmer ex rel. Desyatnik v. Buynak*, 227 F.R.D. 43, 52 (E.D.N.Y. 2005) (denying spoliation sanctions where "plaintiffs bear fault here too, for failing to ever request an inspection of [the destroyed evidence] or a deposition of defendant's expert").[10]

Moreover, considerations of deterrence do not weigh in favor of the sanctions Plaintiff requests. In particular, Farnum's conduct in failing to preserve the records at issue hardly constitutes the type of evasive or obstructive behavior the spoliation doctrine was designed to prevent. Farnum testified that he destroyed the records because he simply "had to clean up the desk" when he retired. Tr. at 205:1–12. There is no evidence that Farnum's decision to destroy the records at issue had anything to do with this litigation. *See, e.g., Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14-CV-2590 (VM) (JCF), 2016 WL 6705773, at \*6 (S.D.N.Y. Nov. 9, 2016) (explaining that, where a party's "willful conduct occurred even before the law suit commenced," the "deterrent value of a sanction is diminished"). Nor is there any evidence that Farnum specifically chose to destroy records related to Plaintiff's employment—indeed, when questioned by the Court, Farnum testified that he threw away records related to "everyone," not just to Plaintiff. Tr. at 205:6–7. To be sure, the record suggests that Defendants were not as organized or careful as they should have been: Defendants' current counsel did not meet Farnum

---

[10] The Court recognizes that Plaintiff was proceeding *pro se* during discovery in this action. Nonetheless, even when Plaintiff was well represented by counsel at trial, he did not seek to review any of the reports that Farnum may have destroyed.

36

before his retirement, *see* Tr. at 208:10–12, and it is at least possible that the WCB had not informed Farnum of his duty to preserve records in connection with this action. Yet despite Defendants' negligence, it does not appear that they acted with a level of culpability that warrants a harsh sanction.[11]

In light of Defendants' relatively limited culpability and Plaintiff's failure to request or inquire about the existence of the corrected reports, the Court declines to make an adverse inference or strike any testimony. Nevertheless, in its capacity as factfinder, the Court has considered the potential destruction of the reports, and has accordingly given less weight to the testimony by defense witnesses regarding errors in Plaintiff's work. *Cf. Golia v. Leslie Fay Co.*, No. 01-CV-1111 (GEL), 2003 WL 21878788, at *11 (S.D.N.Y. Aug. 7, 2003) (giving a permissive, rather than a mandatory, adverse inference instruction to the jury on similar facts).[12]

---

[11] Plaintiff also argues that, had the records been preserved, he would have received them through Defendants' disclosures under Federal Rule of Civil Procedure Rule 26(a)(1)(A)(ii). This argument is not persuasive. By its terms, Rule 26(a)(1)(A)(ii) only requires the disclosure of "documents, electronically stored information, and tangible things that the *disclosing party* . . . may *use* to support *its* claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphases added). The advisory committee notes to the Rule's 2000 amendment clarify that "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use." Fed. R. Civ. P. 26 Advisory Committee Notes. While Plaintiff is correct that Defendants' witnesses ultimately testified about the errors in his investigative reports, Plaintiff has made no claim that Defendants ever "intend[ed] to use" Farnum's copies of the corrections to his reports. *Id.* It is thus far from clear that Rule 26(a)(1)(A)(ii) would have required Defendants to disclose the records at issue.

[12] Even if the Court were to grant Plaintiff's motion for sanctions, it would not find that Plaintiff is entitled to relief on any of his claims. As discussed above, the purported errors in Plaintiff's investigative reports were only one of several legitimate, non-discriminatory reasons for his termination: Defendants explained that they also terminated Plaintiff because (1) he established poor relationships with his supervisor and coworkers, (2) he failed to follow instructions, (3) he did not communicate well with members of the public, and (4) he was not efficient in using the WCB's computer system and databases. Plaintiff has not shown that any of these stated reasons for his termination were mere pretext for discrimination or retaliation. Thus, even if the Court were to accept Plaintiff's testimony that his work product was "perfect," Tr. at 59:18–19, it would not find that he suffered any adverse employment action or was treated any less well because of his protected characteristics or activities.

## CONCLUSION

In sum, the Court concludes that Plaintiff is not entitled to relief on any of his claims. Accordingly, the Court enters judgment in favor of the WCB on Plaintiff's discrimination and retaliation claims under Title VII and judgment in favor of Winston Farnum on Plaintiff's discrimination and retaliation claims under Section 1983, the NYSHRL, and the NYCHRL.

The Court notes that the parties' submissions in connection with Plaintiff's motion for sanctions have not been publicly filed. No later than June 30, 2017, the parties shall file these submissions on ECF.

The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated:     June 28, 2017
            New York, New York

Ronnie Abrams
United States District Judge